IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TERESA RENEE SORROWS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:17-CV-02250 |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 14) and Brief in Support (Document No. 15), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 16), and Defendant's Cross Motion for Summary (Document No. 12) and Brief in Support (Document No. 13). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Cross Motion for Summary Judgment (Document No. 12) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 14) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on October 13, 2017. (Document No. 10).

## I.    Introduction

Plaintiff, Teresa Rene Sorrows ("Sorrows") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner").  Sorrows argues that the Administrative Law Judge ("ALJ") failed to properly weigh the opinions of the medical practitioners and that the ALJ, Mark Dowd, committed errors of law when he found that Sorrows was not disabled.  Sorrows argues that the ALJ's residual functional capacity determination is not supported by substantial evidence, and he failed to properly weigh the opinion from treating physician Dr. Allen and Plaintiff's testimony. Further, Sorrows argues that the ALJ's Step Five determination is unsupported by substantial evidence. Sorrows seeks an order reversing the ALJ's decision, and awarding benefits, or in the alternative, remanding her claim for further consideration.  The Commissioner responds that the ALJ properly weighed the medical source opinions of record and that he properly found Plaintiff not disabled at Step Five. Further, the Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Sorrows was not disabled, that the decision comports with applicable law and that the decision should, therefore, be affirmed.

## II.    Administrative Proceedings

On October 30, 2012, Sorrows filed for Supplement Security Income ("SSI") claiming she has been disabled since January 1, 2005, due to bipolar disorder, anxiety, diabetes, carpal tunnel, and arthritis. Administrative Transcript ("Tr.") at 78. The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 85, 97). Sorrows then requested a hearing before an ALJ. (Tr. 117). The Social Security Administration granted her request, and the

ALJ held a hearing on April 4, 2014. (TR. 38). On August 4, 2014, the ALJ issued his decision finding Sorrows not disabled. (Tr. 22-32).

Sorrows sought review by the Appeals Council of the ALJ's adverse decision on August 19, 2014. (Tr. 17). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Sorrows's contentions in light of the applicable regulations and evidence, the Appeals Council, on December 3, 2015, concluded that there was no basis upon which to grant Sorrows's request for review (Tr. 1). The ALJ's findings and decision thus became final.

Sorrows has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Cross Motion for Summary Judgment (Document No. 12). Likewise, Plaintiff has filed a Motion for Summary Judgment. (Document No. 14). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 724. (Document No. 6). There is no dispute as to the facts contained therein.

## III.    Standard of Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any act, if supported by substantial

evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The commissioner applies a five-step sequential process to determine disability status:
>
> 1. If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of

proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his August 4, 2014, decision, that Sorrows was not disabled at step five. In particular, the ALJ determined that Sorrows had not engaged in substantial activity since October 30, 2012, the application date (step one); that Sorrows's arthritic ankles and feet and bilateral tendonitis of the Achilles were severe impairments (step two); that Sorrows did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); that Sorrows had the RFC to perform less than the full range of sedentary work. In particular,

> [she] is limited to standing or walking no more than three hours in an eight hour workday, cannot climb ladders, ropes, or scaffolding, but can climb ramps and stairs on an occasional basis. [She] is limited to work tasks that are simple, routine, and repetitive and performed in a work environment free of fast paced production requirements and involve only simple work-related decision, with few, if any, work place changes.

The ALJ further found that Sorrows was unable to perform any past relevant work (step four); and that based on Sorrows's RFC, age, education, work experience, and the testimony of a vocational expert, that Sorrows could perform work as a telephone solicitor, an order clerk, or a surveillance monitor, and that Sorrows was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's five step finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating,

examining and consultive physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Evidence

The objective medical evidence shows that Sorrows has been treated for bipolar disorder, anxiety, diabetes, carpal tunnel and arthritis.

The record consists of the treatment records from Dr. Angelis Berios, M.D. between March 29, 2010 and March 6, 2014. These records indicate that Sorrows received treatment at the Porter Family Medical Center on sixteen separate occasions over this time period for a variety of impairments.[2] For example, on April 1, 2010, Sorrows received treatment for head pain and throbbing in the back of her head. Dr. Berios conducted a CT Scan and there were no findings of injury or reason for a follow-up. On June 6, 2010, Sorrows was seen by Dr. Berios for a bruised eye and cheekbone and redness in her eyes. Dr. Berios conducted a vison test and concluded Sorrows's vision was 20.20 in her right eye, 20/40 in her left eye, and 20/20 in both eyes. On April 15, 2011, Sorrows sought treatment at Porter Family Medical Center for upper back pain. Dr. Berios recommended weight loss and prescribed pain and diet medications. On May 13, 2011, Sorrows complained of depression and sought a refill for her diet pills. On September 13, 2011, Sorrows complained of left ear pain, a cough, and congestion. Dr. Berios examined Sorrows and

---

[2] The record reveals that Sorrows was treated at Porter Family Medical Center on March 29, 2010 (Tr. 525), April 1, 2010 (Tr. 523), June 10, 2010 (Tr. 522), April 1, 2011 (Tr. 515), April 15, 2011 (Tr. 514), May 13, 2011 (Tr. 513), September 13, 2011 (Tr. 512), November 14, 2011 (Tr. 511), November 16, 2011 (Tr. 524), March 8, 2012 (Tr. 510), August 20, 2013 (Tr. 507), September 4, 2013 (Tr. 505), October 8, 2013 (Tr. 503), November 12, 2013 (Tr. 502), December 9, 2013 (Tr. 624), and March 6, 2014 (Tr. 622).

concluded that she did not have a fever or ear drainage. Further, Sorrows did not have a sore throat. Dr. Berios prescribed sinus medication. On November 14, 2011, Sorrows returned with the same complaint of her left ear pain. She also complained of diarrhea, a stuffy nose and sneezing frequently. Dr. Berios prescribed ear ache medicine. On March 8, 2012, Sorrows complained of an ear ache. She reported loss of hearing and a "stuffy head." (Tr. 510). After an exam, Dr. Berios concluded that Sorrows was obese and showed signs of depression. Dr. Berios prescribed medications to treat the ear pain and sinus medicine. On August 20, 2013, Sorrows complained of stomach problems. Dr. Berios conducted a physical exam and concluded Sorrows suffered from Esophageal reflux and Morbid obesity. Dr. Berios prescribed Sorrows with reflux medication and ordered lab tests. (Tr. 540-541). On September 4, 2013, Dr. Berios reviewed the lab results. The results revealed that Sorrows had "Diabetes mellitus without mention of complication, type II or unspecified type, not stated as uncontrolled" and high cholesterol. (Tr. 506). For this, Sorrows was prescribed Atorvastatin Calcium Tablets and Metformin HCl Tablets. Sorrows was seen again on October 8, 2013 requesting medication refills. On December 9, 2013, Sorrows came to Dr. Berios for a check up. (Tr. 625). Lastly, Sorrows sought treatment for a "Painful rash on private area." (Tr. 622). After examining Sorrows, Dr. Berios prescribed Nystatin-Triamcinolone Cream.

The record also consists of ten treatment records from Family Psychiatry of the Woodlands between September 6, 2012 and February 25, 2014.[3] For example, on September 6, 2012, Sorrows was examined by Dr. Lucas. Sorrows reported that her mood improved after taking Zoloft. On October 5, 2012, Sorrows saw Dr. Lucas for a mental status exam. Sorrows reported that she was

---

[3] The record reveals that Sorrows was treated at Family Psychiatry of the Woodlands on September 6, 2012 (Tr. 313), September 20, 2012 (Tr. 317), October 5, 2012 (312), January 8, 2013 (Tr. 326), April 18, 2013 (Tr. 495), September 4, 2013 (Tr. 499), October 29, 2013 (Tr. 493-494, 496), January 6, 2014 (Tr. 819), January 23, 2014 (Tr. 615, 616), and February 25, 2014 (Tr. 615).

to have a birthday soon, had very little anger, and that she can no longer afford her truck. Dr. Lucas noted that Sorrows walking around during the appointment. Sorrows complained of her medications. Sorrows's prescriptions were refilled. The claimant canceled her appointments December 19, 2012 and December 20, 2012. On January 8, 2013, Sorrows stated that she "feel[s] much better now" after a reduction of her dosage of Paxil. The patient sat through this appointment. She stated that her anxiety was well-controlled, and she experienced infrequent periods of racing thoughts. Dr. Lucas noted that overall, Sorrows had improved since her last visit. On April 18, 2013, Sorrows was prescribed Ativan, a bipolar and depression medication. Sorrows canceled her appointment with Dr. Sullivan on September 4, 2013. On October 29, 2013, Sorrows came for a check up. Dr. Sullivan and Dr. Laura Champagne conducted the medical exam on the claimant. The exam revealed that the claimant had:

    Psych:
            Speech is: normal rate, volume and tone
            Thought Content: No SHI
            Perception: No AVH
            Association: goal directed
            Memory: intact
            Mood: happy

(Tr. 497-498). Sorrows elected to continue her current treatment but decrease the dosage of Abilify to 7.5mg. On January 23, 2014, Sorrows had an appointment with Dr. Lucas. The mental statuts exam revealed:

    Appearance:
            Good grooming and hygiene
    MS:
            Normal
    Psych:
            Speech is: normal rate, volume and tone
            Thought Content: No SHI
            Perception: No AVH
            Association: goal directed
            Memory: intact

9

Mood: neutral

(Tr. 616-617).

The record also consists of treatment records from Dr. Marian Allen at the Maternal and Family Clinic between September 6, 2012 and January 7, 2013, who treated Sorrows for a variety of impairments[4]. For example, on September 6, 2012, Sorrows complained of wrist and shoulder pain. Dr. Allen prescribed physical therapy and gave the patient a splint for her arm. On October 5, 2012, Sorrows was seen by Dr. Allen to discuss the bloodwork and to change the treatment plan for the pain in her arm. Dr. Allen "advised [Sorrows] to get plenty of rest and push fluids." (Tr. 434). Next, Sorrows went to see Dr. Allen on October 23, 2012. Sorrows complained of neck pain, ankle swelling, shoulder pain, and ankle pain. After a physical exam of Sorrows, Dr. Allen concluded her general appearance was abnormal; the patient appeared "well developed" but "chronically ill." (Tr. 429). She was "obese,...well groomed, [and] appear[ed] tired." (Tr. 429). She also appeared "acutely exhausted" but "well hydrated." (Tr. 429). After an examination of the claimant's extremities, Dr. Allen concluded that Sorrows's left ankle had a "1+ pitting edema" and her reflexes were abnormal. (Tr. 429). Dr. Allen ordered an X-Ray of the right ankle. Dr. Allen prescribed more physical therapy and suggested stretching the neck while sitting in a chair. On October 23, 2012, Sorrows had the X-Ray of her right ankle completed at Premier Imaging. On November 20, 2012, Sorrows went back in to see Dr. Allen for a follow up visit. Dr. Allen ordered an MRI of Sorrows's cervical spine. Dr. Allen noted that the patient had discontinued her physical therapy. On January 7, 2013, Sorrows returned for a follow up appointment. Sorrows reported that she could no longer go to physical therapy as her transportation would not take her there. Sorrows

---

[4] The record reveals that Sorrows was treated at Maternal and Family Clinic on September 6, 2012 (Tr. 441), October 5, 2012 (Tr. 432), October 23, 2012 (Tr. 428, 431), November 20, 2012 (Tr. 425), and January 7, 2013 (Tr. 306, 422).

complained of right foot pain that began about two months prior due to an injury that occurred at home on a "traction mechanism." (Tr. 422). Dr. Allen noted that Sorrows was "feeling tired" and had "shortness of breath during exertion." (Tr. 422). Dr. Allen noticed the 1+ pitting edema had not progressed, it remained at 1+ on the claimant's left ankle. Dr. Allen diagnosed Sorrows with Tenosynovitis of the ankle, Cervical Radiculopathy, Dipolar Disorder, and Carpal Tunnel Syndrome. Dr. Allen refilled Sorrows's prescriptions for ALPRAZolam, Cyclobenzaprine, and TraMADol. (Tr. 424). Dr. Allen referred Sorrows to a podiatrist.

Dr. Allen completed a questionnaire on January 7, 2012 (Tr. 306). The questionnaire was comprised of fill-in-the blanks, check boxes, and scales of 1-10 for abilities and pain levels. Dr. Allen marked that Sorrows would likely be absent from work "three to four times a month." (Tr. 307) She checked boxes indicating that Sorrows would need breaks from sitting, standing, or walking every 25 minutes, each lasting 15 minutes long.

Next, from January 16, 2013 and February 27, 2014, Sorrows received treatment from Dr. Randel Lepow, D.P.M. on twenty-eight separate occasions[5]. For example, on January 16, 2013, Sorrows complained of "excruciating pain in her Achilles tendon as well as the back of both heels." (Tr. 454). Dr. Lepow took X-Rays which "revealed significant posterior heel spur formation. Treatment alternatives were discussed." (Tr. 454). Dr. Lepow referred Sorrows for an MRI and

---

[5] The record revealed that Sorrows was treated by Dr. Randal Lepow on January 16, 2013 (Tr. 454), January 30, 2013 (Tr. 454), February 6, 2013 (Tr. 2013), February 19, 2013 (Tr. 453), February 26, 2013 (Tr. 453), March 5, 2013 (Tr. 453), March 12, 2013 (Tr. 452), March 19, 2013 (Tr. 452), April 16, 2013 (Tr. 451), April 30, 2013 (Tr. 451), May 21, 2013 (Tr. 450), May 24, 2013 (Tr. 2013), June 4, 2013 (Tr. 709), June 18, 2013 (Tr. 707), July 2, 2013 (Tr. 705), August 21, 2013 (Tr. 703), September 10, 2013 (Tr. 701, 597), September 18, 2013 (596), September 25, 2013 (Tr. 594), October 9, 2013 (Tr. 592), October 31, 2013 (Tr. 590), November 14, 2013 (Tr. 588), November 18, 2013 (Tr. 586), November 26, 2013 (Tr. 579), December 5, 2013 (Tr. 576), December 12, 2013 (Tr. 572), December 30, 2013 (Tr. 556), and February 27, 2014.

would "[r]eevaluate following diagnostic studies." (Tr. 454). Sorrows returned to Dr. Lepow on

January 30, 2013. Dr. Lepow reviewed the MRI of her left foot which revealed

> moderate tendonitis including distal Achilles' tendon. [There] appears to be partial thickness tearing approximate 30% of severity in the attachment. Right foot revealed advanced edema and thickening of the distal 5 cm of the Achilles' tendon with partial thickness tearing of the deep fibrous approximate 50%. There is large amount of edema in the contiguous calcaneus. Also a large amount of swelling as was a pocket of fluid deep in the Achilles' tendon is noted.

(Tr. 454). Dr. Lepow recommended surgical removal of the heel spur and repairing the Achilles' tendon. Sorrows returned on February 6, 2013, and she "elected for the surgical intervention." (Tr. 454). "Patient was tentatively schedule for an outpatient foot surgery at University General Hospital , [sic] on 2/19/13 , [sic] pending final medical history and physical and preoperative laboratory results." (Tr. 454). Sorrows had foot surgery on February 19, 2013 at St. Joseph Medical Center. (Tr. 453).

Sorrows returned for a follow-up on February 26, 2013. Sorrows complained of discomfort, but stated the pain was relieved by analgesics. Sorrows returned a week later to remove cast and sutures. Dr. Lepow advised Sorrows to use a "cam [w]alker and crutches." At a follow-up visit on March 12, 2013, Sorrows was "advised to remove bandages in 24 hours and [return to] normal bathing activities." (Tr. 452). On March 19, 2013, Dr. Lepow noted that Sorrows showed "excellent progress." (Tr. 452). Again, on April 16, 2013, nearly a month later, Dr. Lepow charted that Sorrows showed good progress, and he advised the patient to continue her physical therapy. On April 30, 2013, Sorrows's examination showed her steady progress. Dr. Lepow advised Sorrows to increase her physical activity, finish physical therapy, and return in a month for a reevaluation.

On May 21, 2013, Sorrows was diagnosed with a "partial tear of the Achilles tendon on the left extremity with significant retrocalcaneal exostosis." (Tr. 450). She then "scheduled for

outpatient foot surgery." (Tr. 450). Sorrows had foot repair surgery on May 24, 2013 at St. Joseph Hospital. (Tr. 450). Sorrows returned for a "post op" check up with Dr. Lepow on June 4, 2013. Dr. Lepow reported a "SATISFACTORY POST OP DAY 10." (Tr. 709). Two weeks later, on June 18, 2013 (Tr. 707), Sorrows returned for a check up. Again, Dr. Lepow reported satisfactory progress. He removed the sutures and the foot was redressed. Sorrows was instructed to begin normal bathing and to "continue use of cam walker." (Tr. 707). On July 2, 2013, Dr. Lepow noted that Sorrows had satisfactory progress and was given a new prescription for physical therapy. (Tr. 705). He instructed Sorrows to begin partial weight bearing with aid of cam walker. (Tr. 705). On August 21, 2013, Sorrows returned with the complaint of moderate to severe pain on the inside of her left heel. She also complained of moderate to severe pain across the back of her right heel. (Tr. 703). Dr. Lepow recommended removal of the remaining spurs. On September 18, 2013, Sorrows underwent foot surgery. "The procedures included:

> resection of superior medial spur on the calcaneus. Application of unna boot. The patient noted to tolerate both the procedure and anesthesia well and left the OR in satisfactory condition to the recovery room where all vital signs were stable.

(Tr. 596). Dr. Lepow's postoperative diagnosis of her ankle was "(1) Medial/superior spur to the left calcaneus; (2) Thickening and calcification of the medial aspect of the insertion of the Achilles tendon to the left heel." (Tr. 549). Sorrows returned on September 25, 2013 for her one-week post-op appointment. Dr. Lepow removed her bandages and inspected the surgical site. He noted that the "skin edges [were] well coapted [sic]." (Tr. 594). There was "mild edema" but no redness or signs of infection. (Tr. 594). Dr. Lepow advised Sorrows to keep the surgical site dry. On October 9, 2013, Sorrows returned for her three-week follow up appointment. Dr. Lepow removed all sutures and noted her progress as satisfactory. On October 31, 2013, Sorrows returned for a "follow up of physical therapy as well as post op follow op." (Tr. 590). Sorrows admitted her foot felt well

and that she was ready for her right foot to be operated on. X-rays were taken of the left ankle and Sorrows was recovering as expected. (Tr. 588). Sorrows underwent surgery on November 18, 2013. "The procedures included:

> resection of superior medial superior aspect of right calcxaneus [sic]. The patient noted to tolerate both the procedure and anesthesia well and left the OR in satisfactory condition to the recovery room where all vital signs were stable.

(Tr. 586). Sorrows returned one week later for a follow up. Dr. Lepow noted "some bruising and ocalized [sic] redness...in and aroun[d] the incision." (Tr. 579). He prescribed an antibiotic. On December 5, 2013, Sorrows was seen for her three-week follow up. Dr. Lepow removed all sutures and redressed the surgical site. Sorrows was instructed to remove the bandages 24 hours after the appointment and return to regular bathing. Further, she was advised to continue using the cam walker. On December 12, 2013, Dr. Lepow noted that the edema was "essentially resolved." (Tr. 683). He charted Sorrows's progress as satisfactory. Sorrows returned on December 30, 2013. (Tr. 556). Dr. Lepow instructed Sorrows to increase her physical activity and return to conventional shoes in a month. (Tr. 556). She was seen again by Dr. Lepow, on February 27, 2013. She complained of chronic pain in both ankles. She stated that she had tried soaking them and changing shoes but the pain persisted. Dr. Lepow diagnosed Sorrows with arthritis and ordered X-Rays of both ankles. The X-Rays "revealed some impingement of the anterior ankle." (Tr. 711). Dr. Lepow also ordered an MRI. The MRI of the right ankle revealed

> 1. Moderately advanced to advanced edema and thickening involving the distal 3 cm Achilles tendon. There appear[ed] to be a partial thickness intrasubstance tear of the distal tendon at its attachment site approximately 30 percent in severity. There [was] also a moderately large amount of edema in the surrounding soft tissues with a small pocket of fluid and moderately advanced marrow edema in the contiguous calcaneus along its superior dorsal margin. There [was] a small metallic artifact in the region possibly from prior surgery also at this site.

2. Evidence for moderate to moderately advanced tendinosis/tendonitis involving the peroneus brevis and longus tendons and to a lesser degree tibialis posterior tendon. The tendons themselves appear[ed] to be intact.

3. Moderate thickening and mild edema of the posterior plantar fascia and moderate bony overgrowth. The plantar fascia appear[ed] intact.

4. Moderate cartilage loss of the tibiotalar joint, talonavicular and subtalar joint.

(Tr. 671). The MRI of the left ankle revealed

1. There was moderately advanced edema and thickening involving the distal 3 cm Achilles tendon. Patchy edema in the surround soft tissues as well as some patchy marrow edema in the contiguous calcaneus and bony overgrowth. There [was] likely a partial thickness tear of the distal tendon 20 to 30 percent in severity. There [was] some metallic artifact in this region. There ha[d] been prior surgery at this site. Intact fibers [were] present.

2. There [was] moderate edema and thickening involving the posterior plantar fascia with a large bony spur on the plantar aspect of the calcaneus, represent moderate plantar fasciitis. The plantar fascia appear[ed] to be intact.

3. Evidence for moderately advanced tendinosis/tendonitis involving the peroneus brevis and longus tendons. The tendons themselves appear[ed] to be intact. They appear[ed] thickened and edematous.

4. Moderate cartilage loss and joint space narrowing of the tibiotalar, talonavicular joint and subtalar joint.

(Tr. 673).

During this same time frame, Sorrows was also completing physical therapy at Cole Rehabilitation. Sorrows had her first evaluation on March 28, 2013. She then completed thirty-five more sessions[6] until Dr. Lepow discharged the claimant on December 13, 2013.

On January 22, 2013, Sorrows was evaluated by Dr. George Isaac, M.D.. Sorrows's chief complaints were as follows:

---

[6] The record reveals Sorrows received physical therapy treatment from Cole Rehabilitation from March 23, 2013 through December 13, 2013 (Tr. 416-563).

"borderline diabetis [sic] mellitus for 2 years and pain in the heels due to spurs for 6 months, pain in hands due to carpal tunnel syndrome for one year and pain in right shoulder and feet due to arthritis for 6 months."

(Tr. 334). Dr. Isaac reported that Sorrows was "able to ambulate office area without any difficulty or assistive device and at normal speed." (Tr. 334). Sorrows's physical exam revealed her weight to be 272 pounds and her height to be 64 inches. After an evaluation of the claimant's central nervous system, Dr. Isaac reported that the claimant's "sensory system [was] normal in rest of extremities. Coordination [was] normal. DTR's are normal and 3 + in all extremities except that ankle jerk in right side is 1 + and it is 3 + in left side..." (Tr. 335). Dr. Isaac's evaluation of the patient's extremities follows:

moderate pain and tenderness in anterior aspect of right shoulder. Range of motion of shoulders is normal and full. There is a boggy swelling of one inch in diameter in back of each ankles [sic] at the insertion of Achilles tendons and it is moderately tender in this area. No redness or warmth [was] noted here. Dorsiflexion of ankles [was] possible to 5 degrees and plantar flexion [was] limited to 3 degrees due to pain in back of ankles. There [was] also mild pain and tenderness in bottom of calcaneus in posterior aspect. Inversion and eversions of ankles [was] normal and full. There [was] also mild pain and tenderness in distal ends of radius and ulna and in wrist joints. No redness or warmth or swelling is noted in knees or other joints or in wrists. Range of motion of joints of fingers and wrists [was] normal and full.

Flexion and extension of knees [were] full and [were] associated with mild crepitus in both sides. Range of motion of rest of all joints [was] normal and full. [Sorrows was] able to pick up small objects with fingers of either hand and [was] able to button her clothes. Hand grip and pinch and grasp [were] normal and of moderate strength in both hands. No redness of skin or elevation of temperature or puffiness or swelling or subluxation or instability [was] noted in any joints except for swelling behind ankle as mentioned above.

[Sorrows was] unable to bend and touch the finger to the floor. Fingers stop about 8 inches form the floor. Flexion of lumbar spine is limited to 80 degrees and extension to 5 degrees and lateral flexion to 5 degrees and rotations are slightly limited with pain. [Sorrows was] able to squat partially and get up with support. She [was] unable to walk on her toes and [was] able to walk on heels for a few steps with support and she [was] able to do tandem walking. She [was] unable to hop. She [was] able to stand on either leg alone with support.

Dorsalis pedis and posterior tibial pulsations [were] palpable in both sides and there [was] trace edema of both feet up to 10 inches above ankles. No evidence of any stasis dermatitis or thrombophlebitis [was] notes. No varicose veins [were] noted in legs. No cyanosis or clubbing of fingers [was] noted.

Examination of spine show[ed] no deformities or tenderness. No spasm of muscles of lumbar spine is noted. Straight leg raising test show[ed] that she [was] able to raise either leg to 30 degrees actively and 40 degrees passively. She [was] able to do heel to shin tests on either side with some difficulty to low back pain and pain in knees. Straight leg raising test [was] felt to be positive. Range of motion of cervical spine [was] normal and full.

(Tr. 335-336). Further, Dr. Isaac noted that Sorrows was able to hear and speak with normal fluency and content.

Due to her disability claim, Sorrows was also examined by Dr. Frank Barnes, M.D. on June 10, 2014. Sorrows's chief complaint was the pain in both of her feet. During her initial physical exam, Dr Barnes noted her height of 5 feet, 4 inches tall and weight of 263 pounds. (Tr. 715). Sorrows ambulated without external support. Dr. Barnes noted "soft swelling on both sides of the upper calcaneus" in the right foot. (Tr. 715). Sorrows also had "limitation of dorsiflexion." (Tr. 715). The patient had "increased sensitivity of the skin of her hindfoot. The ankle and subtalar joints [were] stable" (Tr. 715). Dr. Barnes conducted a windlass test. The result was negative. As for the left foot, Dr. Barnes noted that Sorrows had "limitation of dorsiflexion." (Tr. 715). The left ankle was "stable in anterior posterior stress and medial lateral stress. (Tr. 715). The patient was "tender over the medial side of the heel," but "nontender on the sole of the heel." (Tr. 715). Again, the windlass test was negative. X-Rays were taken also. Based on the examination and X-Rays, Dr. Barnes diagnosed Sorrows with a "Bilateral Achilles tendonitis and partial tear" and "Superior calcaneal osteophyte." (Tr. 716). Dr. Barnes completed a "Medical Source Statement of Ability to do Work-Related Activities." (Tr. 717). Dr. Barnes opined that Sorrows would be able to lift and carry "up to 10 lbs" "frequently," sit for 2 hours, stand for 15 minutes, and walk for 15 minutes

during an uninterrupted day. (Tr. 717). In an 8-hour workday, Sorrows could sit for 8 hours, and only stand and walk for 1 hour, respectively. (Tr. 718). Sorrows did not require a cane to ambulate. Dr. Barnes noted that Sorrows could never climb ladders or scaffolding nor could she balance. As for everyday activities which Sorrows could perform, Dr. Barnes checked the following boxes:

| ACTIVITY | YES | NO |
|---|---|---|
| Can the individual perform activities like shopping? | ✓ | |
| Can the individual travel without a companion for assistance? | ✓ | |
| Can the individual ambulate without using a wheelchair, walker, or 2 canes or 2 crutches? | ✓ | |
| Can the individual walk a block at a reasonable pace on rough or uneven surfaces? | ✓ | |
| Can the individual use standard public transportation? | ✓ | |
| Can the individual climb a few steps at a reasonable pace with the use of a single hand rail? | ✓ | |
| Can the individual prepare a simple meal & feed himself/herself? | ✓ | |
| Can the individual care for their personal hygiene? | ✓ | |
| Can the individual sort, handle, or use paper files? | ✓ | |

(Tr. 721).

Sorrows completed a Function Report on December 6, 2012. (Tr. 239-254). With respect to her impairments, Sorrows wrote that her problems vary. "I have arthritis in the whole right side of my body, including my feet. I sometimes walk with a limp because of the pain and my arms stays stiff." (Tr. 239). On a daily basis, Sorrows stated: "When I wake, I get my 14 year old son up for school. I try to walk to help, but the pain is severe. I usually lay down by 6 pm because I am wore out."(Tr. 240). She also stated "my mother helps cook and clean for myself." (Tr. 240). She stated that she "fix[ed] things are very easy such as sandwiches [sic] or toast," but she is able to make her own bed and tries to wash clothes." (Tr. 241). Her mom also helps with laundry. Sorrows enjoys collecting Betty Boop items. (Tr. 243). Sorrows indicated that she fights a lot with her son. When asked to check the boxes that her illness has affected, she checked: "lifting,

squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, following instructions, using hands, getting along with others." (Tr. 244).

Sorrows completed another Function Report on March 11, 2013. On the second report, Sorrows reported "walking" as a hobby. Further, when asked to check the boxes that her illness has affected, she checked: "lifting, squatting, bending, standing, reaching, walking, kneeling, and stair climbing." (Tr. 261). She stated she had issues getting along with authority figures, "especially if [she] get[s] angry." (Tr 262). Sorrows wrote that was using crutches and that a wheelchair had been prescribed by a doctor on February 19, 2013. The two medications she reported taking were "Abilify" and "Paxil." Both caused dizziness.

Here, substantial evidence supports the ALJ's findings that Sorrows's arthritic ankles and feet and bilateral tendonitis of the Achilles were severe impairments at step two. Such impairments at step three, individually or in combination, did not meet or equal a listed impairment. The ALJ addressed listings 1.00B2b, 1.02, and 1.03 and concluded that Sorrows did not meet or equal the listings. With respect to 1.02, a major dysfunction of a joint, the ALJ opined that Sorrows medical evidence did not demonstrate the specified criteria.

> Specifically, the listing requires gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and finding on appropriate acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affect joint with respect to the claimant's ability to ambulate and in reviewing the objective medical records as in 1.00B2b.

(Tr. 26). The ALJ opined Sorrows did not meet this requirement. For listing 1.03, the ALJ wrote:

> Listing 1.03 requires that the claimant demonstrate reconstructive surgery or surgical arthrodesis of a major weight-bearing joint with inability to ambulate effectively. There is no mention in the medical record that the claimant cannot ambulate effectively. While it was reported that the claimant uses a cane to lean on for support when walking, the regulations require the use of a walker or two crutches or two canes.

> Since the claimant shows no evidence of an impairment which meets or equal the criteria of a listed impairment or of a combination of impairments equivalent in severity (not in mere numbers) to a listed impairment, disability cannot be established on the medical facts alone (20 CFR 404.1520(d) and 416.920(d)). It is noted here that no acceptable medical source who has examined the claimant or reviews his records, has offered the opinion that the claimant's impairments (individually or in combination) meet or medically equal a listed impairment.

(Tr. 26). Substantial evidence supports the ALJ's determination that Sorrows did not meet or equal listings as 1.02, 1.00(B2b), 1.03.

RFC is what an individual can still do despite her limitations. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2 (SSA July, 2 1996). The responsibility for determining a claimant's RFC is with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Here, the ALJ carefully considered all of the medical evidence in formulating an RFC that addressed Sorrows's physical and mental impairments. The ALJ's RFC determination is consistent with Dr. Berios's, Dr. Allen's, Dr. Barnes's, Dr. Wright's, Dr. Lepow's, Dr. Isaac's, and Dr. Sullivan's opinions and the record as a whole. The ALJ, based on the totality of the evidence, concluded that Sorrows could perform light work restricted to the extent that she perform at most lifting and carrying no more than ten pounds; she is limited to work tasks that are simple, routine, and repetitive and performed in a work environment free of fast paced production requirements and involve only simple work-related decisions, with few, if any, work place changes and gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

## B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with...other substantial evidence." *Newton*, 209 F.3d at 455. The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown. *Id.* at 455-56. The Fifth Circuit in *Newton* described good cause where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are: (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," and where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the

claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003).

In addition to the rules regarding treating physicians, opinions from examining physicians must be considered. *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017). Generally, more weight is given to the opinion of a medical professional who has examined a claimant than to one who has not. Id. (citing 20 C.F.R. § 404.1527(c)). "And fundamentally, '[t]he ALJ cannot reject a medical opinion without explanation.'" *Id.* (quoting *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000)).

Lastly, ALJs are to consider findings of fact made by state agency consultants as the opinions of non-examining physicians. SSR 96-6P, 1996 WL 374180 at *2. They are not bound by the opinions, but they may not ignore them and must explain the weight given to the opinions in their decisions. *Id.* The opinions of state agency consultants can be given weight only insofar as they are supported by evidence in the case record, considering factors such as supportability of the opinion in the evidence, consistency with the record as a whole, including other medical opinions, and any explanation given by the consultant. *Id.*

Regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

The Commissioner contends that the ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence. According to the Commissioner, the ALJ summarized the medical evidence and explained the weight accorded to the opinions of the medical sources. With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> Turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than those reported above.

> The claimant's impairments are related to her ankles and feet. She has undergone four surgeries, two to each foot. She has a long term history with podiatrist Dr. Randal Lepow for foot pain from tendonitis involving bilateral Achilles tendon. She also suffers from arthritic changes following her multiple surgeries. The claimant was admitted on February 18, 2012 with a diagnosis of retrocalcaneal exostosis with attenuation of the Achilles tendon and a partial tearing and underwent a resection of the retrocalcaneal exostosis with primary repair for the partial rupture to the Achilles tendon. (Ex B5F). She then returned on May 24, 2013 for a reception of the retrocalcaneal exostosis of the left foot and primary repair of the Achilles tendon of the left foot (Ex. B6F). After initial showing progress, she returned on September 18, 2013 with hypertrophy of the medial aspect of the left heel and underwent a resection of a nominal amount of calcified Achilles tendon to the left heel, medial aspect as well as resection hypertrophies bone to the superior and medial aspects of the left calcaneus. (B13F). She also had prominent posterior medial superior bone spurs to her right heal, [sic] leading to a November 19, 2013 resection of a minimal amount of calcified Achilles tendon to the right heel medial aspect, with resection of the hypertrophied bone to the superior and medial aspects of the right calcaneus.

> The claimant's podiatrist noted that on December 30, 2013, six weeks following her most recent surgery, she has shown steady improvement. Subsequent MRI's, taken on March 7, 2014 showed moderate advanced to advanced edema and thickening of the distal Achilles' tendon; a partial thickness tear of the distal tendon approximately 30 percent in severity in the substance of the tendon; a moderately large amount of edema in the surrounding soft tissues with a small pocket of fluid and moderately advanced marrow edema in the contiguous calcaneus along its superior dorsal margin; a small metallic artifact in the region possibly from prior surgery also at this site; evidence for moderate to moderately advanced tendonitis/ tendinitis involving the peroneus brevis and longue tendons and to a lesser degree tibialis posterior tendon; Moderate thickening and mild edema of the posterior plantar fascia and moderate bony overgrowth; and moderate cartilage loss of the

tibiotalar, talonavicular, and subtalar joints on the right. The MRI of the left was similar. (Ex. B21F).

Her most recent follow-up with Dr. Lepow on February 27, 2014 noted that she still complained of pain in both ankles that is moderate in nature. Objective findings noted she had pain with palpation of both ankles it [sic] the anterior aspect pf [sic] the joint. She carries a diagnosis of arthritis. (Ex. B21F).

She was examined by consultative examiner Dr. Frank Barnes, M.D. on June 10, 2013. At that time, his examination revealed she had surgical scars on both feet, with soft swelling and increased sensitivity and tenders over the medical side of each foot and negative windlass tests. Dr. Barnes opined that the claimant could sit for up to eight hours in an eight-hour workday, stand and walk each for one hour in an eight-hour work day, and was limited to carrying up to ten pounds frequently. She also found only occasional foot controls, but that she did not require an assistive device to ambulate and had no limitations with her upper extremities. He also found no balancing or climbing of ladders or scaffolds and occasional limitation to the rest o the postural limitations. The undersigned finds this opinion is consistent with the claimant's postsurgical condition and wit Dr. Barnes's examination. (Ex. B22F).

The claimant was also examined by consultative examiner Dr. George Isaac on January 22, 2013. Dr. Isaac's diagnose [sic] were a history of pain based on possible Achilles tendonitis, calcaneal spur, carpal tunnel syndrome, osteoarthritis, and obesity. He did not confirm any of these diagnosis [sic]. He also opined that the claimant was able to sit, stand, and ambulate the office without an assistive device, lift and carry up to ten pounds to forty feet, and reach, feel , [sic] and grasp normally. These were more observations than opinions as to the claimant's functional limitations. However, to the extend [sic] they are opinions as o [sic] the claimant's functional abilities, they are given great weight as the claimant demonstrated her ability to perform them. (Ex B4F).

The undersigned gives little weight to Dr. Marian Allen's opinion as she completed a preprinted residual functional capacity questionnaire finding extreme limitations including a fifteen minute break every twenty five minutes and the ability to only sit for two hours in an eight-hour workday. The undersigned gives little weight to this opinion as it is a boilerplate form and not consistent with the medial [sic] evidence of record or with Dr. Allen's treatment records. Further Dr. Allen is a general practitioner at a Maternal and Family Clinic, not a specialist and many of her limitations relate to the claimant's upper extremities, which are not related to any severe impairments and are not noted to cause significant limitations in the majority of the claimant's examinations throughout her longitudinal medical history. (Ex. B1F, B8F).

Thus, as discussed above, the objective medical evidence does not provide a basis for finding limitations greater than those determined in this decision. In addition, consideration of the factors described in CFR 404.1529(c)(3)/416.929(c)(3) and

Social Security Ruling 96-7p also leads to a conclusion that the claimant's allegations of disabling symptoms and limitations cannot be accepted, and that the residual functional capacity finding in this case is justified.

The issue to be determined is if the severity of the claimant's symptoms with resultant functional limitations constitutes a disabling condition within the meaning of the Social Security Act. Thus, a determination as to the claimant's credibility is required. The undersigned finds the claimant's alleged activities were not consistent with the activities told to her treating and examining physicians. The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations, including apparently being able to care for a young child at home, which can be quite demanding both physically and emotionally, without any particular assistance.

The undersigned accords the opinions of the state medical and mental health professionals great weight, to the extent that their opinions do not find a disabling impairment, as they are familiar with the Social Security system and they had the benefit of reviewing the entire medical record. Furthermore, the undersigned finds their opinions are consistent with the objective medical evidence of record. (Ex. B1A, B4A).

In view of all of the factors discussed above, the limitations on the claimant's capacities which were described earlier in this decision are supported by the record, but no greater or additional limitations are justified.

(Tr. 28-30). The ALJ assigned Dr. Barnes's and Dr. Isaac's opinions "consistent" and "great weight." (Tr. 29). The ALJ assigned little weight to the opinion of Dr. Allen "as she completed a preprinted residual functional capacity questionnaire finding extreme limitations..." Further, he opined that the questionnaire was in "boilerplate form and not consistent with the medical evidence of record or with Dr. Allen's [own] treatment records." (Tr. 29).

It is the ALJ's job to determine what weight to give medical opinion evidence, and the ALJ here gave proper consideration of the opinion medical evidence when evaluating the medical opinion evidence in this record. "The power to judge and weigh evidence includes the power to disregard" evidence, and the ALJ exercised this power appropriately. *See Greenspan v. Shalala*, 38 F.3d 232, 238 (5th Cir. 1994). The ALJ's decision is a fair summary and characterization of the

medical records. The ALJ thoroughly discussed the medical evidence and gave specific, detailed reasons for the weight given. This factor weighs in favor of the ALJ's decision.

## C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment." *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Here, Sorrows testified to her health's impact on her daily activities. She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. Sorrows testified that her bipolar disorder caused her to "have...lows and highs..." (Tr. 53). At the time, she had not been taking any medications for her mood. Since seeing Dr. Sullivan,

Sorrows has been taking medications and testified she has felt "somewhat" better. (Tr. 54). Sorrows testified that she had "concentration issues" and "long-term [and] short-term memory problems. (Tr. 65-66).

Sorrows also testified that her "ankle" and her "feet" were the reason she was unable to work. (Tr. 54). The foot issues began in 2012. She testified that "it started as heel spurs" which after X-Rays revealed she also "had arthritis." (Tr. 54). Sorrows complained of the arthritis affecting her "right shoulder[,]" her "hand[,]" and her "right wrist." (Tr. 55). She stated that normal walking around, such as, "getting in and out of bed[ and] walking to the mailbox" aggravates her injuries. (Tr. 58). Sorrows testified that she had been going to physical therapy. She testified that the therapy only helped "for a period of time" though her Cole Rehabilitation records reveal that she was reporting minimal to moderate pain levels every time and she was progressing well. (Tr. 59). Sorrows states that she had "constant pain in [her] right ankle." (Tr. 60). She stated that she was not able to walk up stairs but then stated she "walk[s] sideways with the rail." (Tr. 61). She can only stand for "ten minutes." (Tr. 62). Regarding her other joints, Sorrows testified she had "not yet" received "treatment on the right shoulder and the right hand[.]" (Tr. 62-63). She testified that she had "carpal tunnel...in both hands." (Tr. 64).

Lastly, the claimant testified that her 14 year-old son hits her though no medical evidence or other record reflects or supports this testimony. (Tr. 67).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The fourth element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do his previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Patricia Cowen, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question.)" *Bowling*, 36 F.3d at 436.

The ALJ posed comprehensive hypothetical questions to the VE. (Tr. 71-74). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Sorrows was not disabled. Based on the

testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Sorrows could perform the jobs of a telephone solicitor, order clerk, or a surveillance monitor. (Tr. 72). The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Sorrows was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, these factors also weigh in favor of the ALJ's decision.

## VI.    Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Sorrows was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 14) is DENIED, Defendant's Cross Motion for Summary Judgment (Document No. 12) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 3rd day of August, 2018.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

29